316 So.2d 898 (1975)
STATE of Louisiana, DEPARTMENT OF HIGHWAYS
v.
Margery Amiss RONALDSON et al.
No. 10281.
Court of Appeal of Louisiana, First Circuit.
June 30, 1975.
Rehearing Denied August 26, 1975.
*899 Alva J. Jones and Johnie E. Branche Jr., D. Ross Bannister, Charles E. Pilcher, William W. Irvin, Jr., Jerry F. Davis, and Charles E. Pilcher, Asst. Gen. Counsel, Highways Dept., State of La., Baton Rouge, for appellant.
Carey J. Guglielmo, Baton Rouge, for appellees.
Before LANDRY, BLANCHE and YELVERTON, JJ.
BLANCHE, Judge.
Plaintiff-appellant, State of Louisiana, through the Department of Highways, appeals an adverse judgment of the Twenty-first Judicial District Court which granted $41,462.63 to the defendant-appellees, Margery Amiss Ronaldson, et al, representing land expropriated for State Highway use. The award was made subject to a credit of $2,898.00, deposited by the plaintiff in the Registry of the Court, together with five (5%) percent legal interest on the balance of $38,564.63, from the day of taking, May 28, 1969, until paid.
The instant taking occurred pursuant to State Project Number XXX-XX-XX. The purpose of the project was to widen Range Road (Louisiana Highway 3002) in a southerly direction between Denham Springs, Louisiana and Interstate 12, a distance of approximately two miles. The subject property lies on the west side of Range Road, and at its southernmost edge is within 400 feet of the Interstate.
The State expropriated 1.478 acres of the defendants' property, which resulted in their loss of 1,461 feet frontage on Range Road. Said taking amounted to 64,382 square feet. Additionally, the State expropriated two permanent servitudes of drainage. One of the servitudes lay in the southernmost portion of the subject tract and was approximately 20 feet wide and 60 feet long, comprising .058 acres, or 2,526 square feet. The second servitude was taken on the northernmost boundary of the subject tract, approximately 30 feet wide and 400 feet long, comprising .275 acres, or 11,979 square feet.
The State initially offered the defendants $2,898.00 for the three expropriated parcels. Admittedly, this figure was based upon the non-existence of Interstate 12. The defendants refused said offer and that amount was deposited in the Registry of the Court. Thereafter, the subject property was expropriated and this suit was instituted to determine just compensation.
Walker Y. Ronaldson, Jr. answered the suit individually as heir and also as administrator of the Succession of his mother, Margery Amiss Ronaldson, who died subsequent to the institution of suit. A daughter, Mrs. Margery Ronaldson Peterson, also answered the suit individually as heir. The defendants asked $66,328.74 for the taking, and $39,000.00 severance damages, or a total of $105,328.74.
Because of the unusual shape and position of the subject tract, and also because of the unusual position of the expropriated parcels, the following diagram may be referred to for clarification.
*900 
*901 The trial judge gave no reasons, and simply awarded the defendants a total of $41,462.63, less the State's deposit, plus five (5%) percent legal interest from the date of taking for the balance.
The defendants assert that the award was arrived at as follows: The subject tract was valued at the same amount as was the adjacent Rubin Spillman property, which was determined by this Court at 276 So.2d 905, to be $0.49 per square foot. Therefore, for the 64,382 square feet of frontage, he granted $31,547.18. For the 11,979 and 2,526 square feet of servitude taken, he allowed 90 percent of their value, or $5,282.74 and $1,113.97 respectively. Only in connection with the 7,979 square feet laying north of the northern servitude were severance damages allowed, based upon 90 percent of its value, or $3,518.74. The total award was, therefore, $41,462.63.
Defendants contend the State agrees that the foregoing was the basis of the trial judge's award. However, this is an erroneous conclusion, as in its brief, the State makes the following statement:
"No written reasons for judgment were given by the lower court. This award amounts to Twenty Thousand Nine Hundred Fifty One and 90/100 ($20,951.90) dollars per acre or forty eight cents (.48) per square foot for the part taken if the servitudes are calculated at 100% of their per acre value. There appears to be no way to calculate how the lower court arrived at Three Thousand Five Hundred Eighteen and 74/100 ($3,518.74) dollars for the damages awarded."
They then argue in their first specification of error that the trial judge committed manifest error by fixing the value of the subject property by using two transactions involving improved property, whereas the subject tract is unimproved. In view of the above, we conclude that the State does not agree with the defendants' version of how the award was calculated.
The State also asserts manifest error was committed by the failure to use the two Powers' transactions, which totaled 250 front feet and are situated almost directly across Range Road from the subject tract; and in failing to follow the $3,000 per acre value placed upon the subject property in the Succession of Mrs. Margery Amiss Ronaldson in 1972.
The defendants have answered the appeal and allege that:
(1) Severance damages should have been awarded not only for the taking of the northernmost servitude, but also for the southern servitude and the reduction of the depth of the narrow portion of the tract from 110 to 60 feet;
(2) The subject property is more valuable than the adjacent Spillman property, and, therefore, a greater award than $0.49 per square foot is applicable;
(3) The legal interest awarded by the trial court should have been 7 percent rather than 5 percent;
(4) Appellant should be condemned to pay all costs in the trial and appellate courts.
The trial of this case presented three basic issues: (1) a determination of the value of the subject tract at the time of taking; (2) what percentage of that value should be applied to the expropriated servitudes; (3) whether of not severance damages should be allowed for the expropriation of the frontage as well as the two servitudes. Regrettably, the trial judge handed down no reasons to substantiate his conclusion that $41,462.63 was due to the defendants, and it appears that the State does not acknowledge that the trial judge utilized $0.49 per square foot as in the Spillman case. In view of the fact that we do not know what action the trial judge took concerning the servitudes and severance damages, we have no way of determining what he considered to be the value of the expropriated parcels.
*902 We are forced, therefore, to review the evidence presented at the trial and establish that value de novo. Once that value is established, we can determine the compensation for the servitudes. The third determination will be whether or not severance damages are due.
The State's first expert, Dan Carlock, testified the highest and best use of the property was commercial. Using the market approach, that is, comparable sales in the area, he concluded that the value of the property was $7,000 per acre, or $0.16 per square foot, at the time of taking. As comparables, he used the P. W. C. tract, purchased from the defendants herein on June 6, 1967, for $3,000 per acre; the Spillman tract, purchased on January 25 and May 17, 1968, for $7,805 per acre; the Waldrep tract, purchased December 7, 1967, for $9,639 per acre; and the Roy and William Powers' tracts, both purchased on July 19, 1968, for an identical $8,571 per acre.
All the comparables used by Carlock were unimproved at the time of sale, as is the subject tract. They all had frontage on Range Road, but only one of the five, the P. W. C. tract, had footage comparable to the subject tract. He acknowledged, however, that the P. W. C. tract was greater in depth than the subject tract. He also acknowledged that the other comparables had much less front footage than the subject tract. He did update the comparable sales for time, but did not elaborate upon his method.
Although he allowed full value for the expropriated frontage, Carlock allowed only 90 percent of the value for the two servitudes taken, reasoning that the owner still had rights in the property. He allowed severance damages of 80 percent of its value for the small strip of land north of the northern servitude, opining that for all practical purposes, it could no longer be effectively used as part of the subject tract.
Because of the existing drainage canal which runs through the entire property, he acknowledged that the southern servitude had the effect of reducing the dept of the subject property fronting approximately 150 feet on Rushing Road. However, he rejected severance damages for that taking. His contention was that any irregularity in shape which caused the property north of the southern servitude to be cut off from access to Rushing Road was caused by the defendants' own doing; that is, their prior sale of the corner property to Harco, who in turn sold a portion thereof to Humble. He also rejected severance damages for the reduction of the narrowest portion of the tract to the east of the drainage canal from 110 feet to 60 feet.
Based upon the foregoing, Carlock determined that $12,444 was due for the taking, plus $560 in severance damages, for a total compensation of $13,004.
The State's other appraiser, John Allphin, agreed that the highest and best use of the subject tract was commercial and he also used the market approach. His conclusion was that the subject property was worth $7,300 per acre, or $0.16 per square foot, at the time of taking, relying upon the same comparables as did Carlock. He, too, valued the servitudes at 90 percent of the appraisal value and concluded the property expropriated was worth $12,975. He, like Carlock, allowed severance damages only for the narrow strip lying to the north of the northern servitude, however, at 90 percent of its value, or $660. His opinion of the total compensation owed, therefore, was $13,635, compared to Carlock's $13,004.
He allowed no severance damages for the sourthern servitude because, in his opinion, the servitude drainage was an improvement to the property. He also did not allow severance damages for reduction in the distance from the drainage canal to the road, reasoning simply that the shape of the property remained unchanged.
*903 The defendants' expert, J. B. Pugh, used only the easternmost 12 acres of the 18 acres which the State contended comprised the entire subject tract. He reasoned that the 12 acres lying east of the drainage canal was of a different usage potential than the land west of said canal. He defended his position on the basis that the State likewise did not use the entire extent of the property owned by the Ronaldsons, as they also owned contiguous property lying to the south of Rushing Road. He also argued that if the defendants were to sell the entire 18 acre tract as considered by the State, they would be forced to value the two portions differently, and the eastern section would be the most valuable. In essence, the defendants' appraiser argued that the subject property was two separate tracts; one lying to the west of the drainage canal, and one to the east. The property east of the canal was considered by him as prime commercial property with one usage throughout, and his appraisal was based on this premise. He agreed the highest and best use was commercial and also used the market sales approach.
His comparables were of improved property rather than unimproved; however, the subject tract at the time of taking was unimproved. His justification for using improved properties as comparables was that his investigation of the improved sales revealed that the improvements had little, if any, effect on the purchase price. In fact, Robert S. Mellon, purchaser of one of those tracts, testified that the improvements on his tract played no part whatsoever in his valuation of the tract when he purchased it.
Pugh's comparables were the purchase by Mellon on November 16, 1967, for $24,000, or $0.42 per square foot, and the Lard Number 1 and Number 2 purchases both on January 23, 1969, and which averaged out to $0.55 per square foot. He admitted his comparables were smaller in size and front footage than the subject tract.
He differed from the State's appraisers in that he considered the servitudes should be valued at 100 percent of their value, as the defendants were entirely precluded from using that portion of their property which comprised the servitudes.
Based upon his comparables and adjusting for time and size, he concluded that the subject tract was worth $19,602 per acre, or $0,45 per square foot. Using these figures, he arrived at a total of $35,499 for the value of the property taken.
Regarding severance damages, Pugh determined that the property was damaged by each of the three takings, rather than just by the northern servitude as concluded by the State's appraisers. He felt the .18 acre tract lying immediately north of the northern servitude was damaged to 90 percent of its value because the owner was precluded from using it for almost any purpose. He also felt that reducing the narrowest portion of the tract from 110 to 60 feet caused damage in the amount of 75 percent to 12,500 square feet in that particular area.
Also as a direct result of his considering the subject property as two separate tracts, he contended severance damages were due because of the southern servitude. He reasoned that the land to the north of the servitude between the canal and the defendants' property line was effectively severed from a frontage on Rushing Road and was damaged by 40 percent of its value. He concluded that in order for that portion of the property to be used in connection with the frontage on Rushing Road, a bridge would have to be built across the servitude.
Pugh arrived at severance damages of $12,021, and by the addition of $35,499 for the land value, he concluded that the total compensation due was $47,520.
The defendants' other appraiser, John LeJeune, also considered the highest and best use was commercial and utilized the market data approach. He relied chiefly *904 upon the same three sales as did Pugh. His opinion was that the subject property was superior to both the Lard and Mellon tracts for commercial use. For this reason, he concluded the subject tract was valued at $0.75 per square foot at the time of taking. He, too, considered the subject tract as two separate parcels.
He acknowledged that the comparables he utilized had sold for less value per square foot than his appraisal of the subject tract. To justify his conclusion that the subject tract was more valuable, he noted that it had a much greater front footage on Range Road than did the comparables. He considered Range Road would become the main thoroughfare in Denham Springs as evidenced by the instant project which was widening said road to four lanes. Therefore, he thought it was very valuable commercial property. He also noted the subject property was closer to the Interstate than any of the comparables used, was high, and had been cleared.
He contended that the price most indicative of the value of commercial property is the price paid by the ultimate user of the tract. He reached this conclusion based upon a study he had done of property along the Interstate Highway system. He discovered that the original landowner would usually get the lowest price, the speculator would get the middle price, and the ultimate user would pay the highest price.
He testified that William and Roy Powers, and Waldrep, who were the purchasers of three of the comparables used by the they purchased their tracts. To substantiate not pay the top commercial price when they purchased their tracts. To substantiate this contention, he cited that the Powers' and Waldrep tracts were combined and sold as one piece to an ultimate user, Poole Funeral Home. He therefore felt that even though the subsequent sale to Poole could not be utilized for price as it occurred after the instant taking, the purchase price paid by the Powerses and Waldrep was not indicative of the true value of the subject tract, since it was speculative.
He also urged that frontage accounts for the commercial value of a tract. He noted that the frontage of the subject tract was much greater than any of the comparables used by the State except the P. W. C. tract. He then declared that the P. W. C. tract was not a good comparable even though it was located directly across the road from the subject tract and possessed relatively the same front footage because it was much larger in size; 43 acres versus 12 acres. He opined that if the front 12 acres of the P. W. C. tract were sold off, it would bring the same price as what he concluded the 12 acres of the subject tract would bring. The essence of his conclusion was that the rear portion of the P. W. C. tract was less valuable than the front portion bordering on Range Road.
By valuing the servitudes at 100 percent of their value, he concluded the land taken was worth $51,165.
Regarding severance damages, he felt the land north of the northern servitude suffered a loss of $0.50 per square foot, or $3,990. He felt the land lying north of the southern servitude was also damaged as a result of the taking and lost $0.50 per square foot in value, or $12,500.
He considered that the section of land narrowed from 110 to 60 feet front depth was damaged by 25 percent of its value, or $2,375. He concluded that the only use of the strip narrowed as a result of the taking was to traverse the property from north to south. Therefore, no permanent structure could be or should be built there. His severance damages totaled $18,865, and, therefore, he concluded the total compensation due was $70,030.
One of the defendants, Margery Ronaldson Peterson, testified that the P. W. C. sale by the Succession of her father was made to pay off debts after his decease.
*905 This testimony was obviously to point out that the low $3,000 per acre figure for the sale of the P. W. C. tract was a distress sale. The defendants evidently wanted to show the P. W. C. sale was not the ordinary commercial transaction, and, therefore, was not indicative of the value of the subject tract.
In an expropriation proceeding, the landowner is entitled to the market value of the property taken, calculated upon its best and highest use. Market value is the price paid as between a willing and informed buyer and a willing and informed seller in the ordinary course of business, State, Department of Highways v. Spillman, 276 So.2d 905 (La.App. 1st Cir. 1973). Obviously, both parties considered that the best indicia of market value is the price paid for similar properties, as the experts for both sides used this same approach. To determine market value, courts utilize the testimony of expert witnesses, Louisiana Power & Light Company v. Gaupp, 255 La. 563, 232 So.2d 273 (1970); State, Department of Highways v. Hickman, 277 So.2d 525 (La.App. 3rd Cir. 1973).
The State's experts both determined that the tract wherein the parcels lay had a value of $0.16 per square foot. One of the defendants' experts, LeJeune, arrived at $0.75. The best reasoned appraisal was by the defendants' appraiser, Pugh, who concluded $0.45 per square foot. The State has not contended the defendants' valuation of only the 12 acres lying east of the drainage canal was improper and we conclude that the defendants' experts' testimony established that this was the best method of evaluation. In our view, what was done by the defendants' appraisers was a front land-rear land valuation of the subject tract. Under the facts of the instant case, we consider that to be an appropriate method. The existing drainage canal separates the tract into two distinct parcels, one of which has a much higher commercial use potential than the other. We therefore consider the value of the subject tract at the time of taking was $0.45 per square foot, and the sum of $28,971.90 is the value of the 64,382 square feet of frontage expropriated in fee.
The State's contention that the succession valuation of $3,000 is controlling in the instant case is without merit. It was not a transaction between a willing buyer and seller and additionally, the said value was placed upon the property subsequent to the taking.
Although we realize that there is little use to which the servitudes can be put by the defendants, their taking is nevertheless short of a taking in fee or full title, and, therefore, 90 percent of their value is just compensation in the instant case. Accordingly, the 2,526 square feet comprising the southern servitude was worth $1,023.03 at the time of taking; and the 11,979 square feet comprising the northern servitude was worth $4,851.49.
Regarding severance damages, both sides agree that the 7,979 square foot area lying to the north of the northern servitude was damaged in view of the fact that the defendants are precluded from using it for almost any purpose. We consider, therefore, that it was damaged by 90 percent of its value, and damages of $3,231.49 are in order.
The southern servitude has isolated an area of 25,000 square feet directly behind the Harco property. As the defendants' experts noted, the only way said area can be effectively utilized with the frontage on Rushing Road is to build a bridge over the servitude to connect the rear with the front. As a result, this section of the tract lost 40 percent of its value, and damages of $4,500 are awarded.
An area of approximately 12,500 square feet was damaged by the narrowing of the subject tract from 110 feet to 60 feet at the easternmost edge of the drainage *906 canal. The size of the damaged area was determined by calculating the square footage lying to the east of the canal which now has a depth of less than the original 110 feet. This area is illustrated by the waving lines on the above diagram. As a result of the taking, this 12,500 square foot area lost 75 percent of its value because prime commercial property must be at least 100 feet in depth. Therefore, damages if $4,218.75 are due to the landowners.
Accordingly, $28,971.90 is due for the frontage expropriated; $1,023.03 for the southern servitude, and $4,851.49 for the northern servitude. $3,231.49 is due as damages resulting from the taking of the northern servitude, $4,500 for the taking of the southern servitude, and $4,218.75 for the reduction of the narrowest section of the subject tract to 60 feet. The total award is, therefore, $46,796.66, less a credit of $2,898. On the balance of $43,898.66, interest is due from May 28, 1969, until paid. The defendants contend said rate of interest is seven percent, but the trial judge awarded five percent.
R.S. 48:455 entitles the landowner to interest from "the date title vests in the plaintiff to the date of payment." Title vested in the plaintiff on May 28, 1969, and, therefore, the defendants' right to legal interest vested on that date.
Subsequent to the taking, Act 315 of 1970 amended Civil Code Articles 1938 and 2924, increasing the legal rate of interest from 5 percent to 7 percent. In State, Department of Highways v. Beaird-Poulan, Inc., 305 So.2d 505 (La.Sp.Ct.1974), it was decided that the increase to 7 percent was applicable to expropriations under Section 455. In view of this, the defendants claim that it was error not to award 7 percent as per the amendment.
Legal interest is a matter of substantive law, and a change therein should not be given retroative effect unless the Legislature so provides, Parish of East Baton Rouge v. Harrison, 260 So.2d 106 (La. App. 1st Cir. 1972), writ refused 261 La. 1062, 262 So.2d 43 (1972). Therefore, since the judicial rate of interest was 5 percent when the State became obligated therefor, a subsequent change in said rate has no effect thereon under the holdings of Harrison; Saragusa v. Dipaola, 290 So.2d 766 (La.App. 1st Cir. 1974), writ refused, 293 So.2d 185 (La.1974); and Brouillette v. State, Through Department of Highways, 275 So.2d 196 (La.App. 3rd Cir. 1973).
State, Department of Highways v. M. G. Realty Co., Inc., 295 So.2d 469 (La. App. 3rd Cir. 1974), writ refused, 299 So. 2d 799 (La.1974), relied upon by the defendants for the proposition that expropriations by the State bear interest at 7 percent is factually inapposite to the instant case. Defendants correctly assert that in M. G. Realty and the more recent Beaird-Poulan, Inc., cases, it was decided that 7 percent is the applicable interest rate under R.S. 48:455. However, those takings occurred after the amendment which increased the rate to 7 percent, whereas the instant taking occurred before, when the rate was still 5 percent. Therefore, under Harrison, supra, the change in the rate has no effect on the instant taking.
Defendants also argue that the State should not be allowed to appeal from the April 11, 1974, judgment of the trial court without paying the applicable 7 percent rate. This argument overlooks the fact that the right to said interest vested the day of taking, May 28, 1969.
For the above and foregoing reasons, the judgment of the Twenty-first Judicial District Court which granted $41,462.63 to the defendant-appellees, Margery Amiss Ronaldson, et al., subject to a credit of $2,898, together with five (5%) percent legal interest on the balance of $38,564.63 from May 28, 1969, is hereby set aside.
It is ordered, adjudged and decreed that the State of Louisiana, through the Department *907 of Highways, pay to the defendant-appellees the sum of $28,971.90, representing property expropriated in fee, $5,874.52 for servitudes expropriated, and $11,950.24 in severance damages, for a total of $46,796.66. Said award is made subject to a credit of $2,898 deposited by plaintiff in the Registry of the Court, together with legal interest at the rate of 5 percent on the balance of $43,898.66, from May 28, 1969, until paid. The appellant is cast for all costs of these proceedings as may legally be assessed against the State of Louisiana.
Reversed in part, affirmed in part, and rendered.